Paul A. LEVINS, Petitioner,

v.

BENEFITS REVIEW BOARD, UNITED STATES DEPARTMENT OF LABOR, Respondent.

No. 83–1319.

United States Court of Appeals, First Circuit.

Argued Nov. 8, 1983.

Decided Jan. 5, 1984.

---

* Of the District of Montana, sitting by designation.

Joseph T. Doyle, Boston, Mass., with whom Condon & Doyle, Boston, Mass., was on brief, for petitioner.

Ellen S. Cooper, Boston, Mass., with whom Cynthia J. Cohen, and Parker, Coulter, Daley & White, Boston, Mass., were on brief, for the appellees Employer/Carrier, B.S. Costello, Inc., and Midland Ins. Co.

Before CAMPBELL, Chief Judge, SWYGERT,* Senior Circuit Judge, and BOWNES, Circuit Judge.

BOWNES, Circuit Judge.

This is an appeal from an order of the Benefits Review Board (the Board) denying compensation benefits to petitioner under the Longshoremen's & Harbor Workers' Compensation Act as amended, 33 U.S.C. §§ 901 *et seq.* (the Act). The Board, with one member dissenting, held that petitioner did not meet the statutory requirement of "any person engaged in maritime employment," 33 U.S.C. § 902(3), and was therefore not a covered "employee" under the Act.

The facts were found by an administrative law judge (ALJ) as follows. Petitioner Paul Levins was employed as a book clerk for B.S. Costello, Inc., on January 23, 1979, when he injured his back as the result of a fall in the employee parking lot in Moran Terminal, Port of Boston. His duties as a book clerk included the processing of ship manifests and the recording and identifying of cargo being loaded and unloaded for export and import. This work involved documentation concerning receipts and deliveries, including storage plans and load lists. According to petitioner's "credible and convincing testimony," the book clerk worked with the runner or hatch clerk[1] in rectify-

---

* Of the Seventh Circuit, sitting by designation.

1. According to the hearing testimony, a "runner" checks the seal numbers on containers against the numbers on a hand manifest when containers are loaded or unloaded. A "hatch clerk" makes sure that containers are loaded in

ing problems such as discrepancies between loading plans and containers; although normal procedure was for the runner to come to his office, petitioner also had to go down to the ship if the containers were incorrectly loaded and he was unable to contact a stevedore. In addition, petitioner testified that he was required to go to the container yard to check discrepancies between the number listed on the manifest for a given container and the number actually on the container. Finally, he testified that there were no runners involved with ships under 300 tons and that the book clerk therefore performed the runner's function and went aboard ship when cargo was being loaded.

The ALJ determined that, although the petitioner did not actually handle cargo, his clerical task was directly related to the handling and movements of cargo, and that the petitioner was responsible for some portion of the activity involved in the loading and unloading of a ship. He also found:

> The Claimant's duties are similar to those of a checker, in that where a checker checks the items of cargo as they are loaded into or unloaded from containers to make sure it is the right cargo, the Claimant checks to make sure that the proper containers are being loaded and unloaded from the vessels, as well as checking to make sure the container [sic] are loaded in their designated places on board.

Under § 921(b)(3) of the Act, the ALJ's findings of fact are conclusive if supported by substantial evidence in the record considered as a whole. The testimony cited by the ALJ in this case meets the substantial evidence standard, and we therefore accept the ALJ's findings to the extent that they relate to matters within his competency. At the same time, we emphasize that neither this court nor the Board owes spe-

cial deference to the ALJ with respect to determinations of statutory policy, even though these may be "fact-sensitive." *Prolerized New England Company v. Benefits Review Board,* 637 F.2d 30, 35–36 (1st Cir. 1980), *cert. denied,* 452 U.S. 938, 101 S.Ct. 3080, 69 L.Ed.2d 952 (1981). The Board did not purport to disturb the ALJ's fact findings, but applied a legal standard which produced a different result. Our review of the Board's order is accordingly limited to errors of law. *Id.* at 35.

The Board, relying on *Maher Terminals, Inc. v. Farrell,* 548 F.2d 476 (3d Cir.1977), ruled that petitioner's primary duties of documenting goods received and delivered were purely clerical and did not constitute "maritime employment" under the Act. The concurring Board member reached the same result on the basis that petitioner did not spend a regular portion of his time in the loading and unloading of cargo.

The Act provides compensation for disability or death of an "employee" under certain conditions.[2] The only issue in this case is whether petitioner meets the statutory definition of an employee, set out in § 902(3):

> The term "employee" means *any person engaged in maritime employment,* including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.

(Emphasis added.) As the Supreme Court pointed out in *Northeast Marine Terminal Co., Inc. v. Caputo,* 432 U.S. 249, 265–67, 97 S.Ct. 2348, 2357–58, 53 L.Ed.2d 320 (1977),

---

the proper order and location aboard ship and checks the numbers on containers as they are unloaded.

2. Apart from the "maritime employment" requirement, the other major statutory prerequisite is that the injury occur "upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, build-

ing way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel)." 33 U.S.C. § 903(a). The "situs" requirement was not an issue before the ALJ, who expressly found that it was fulfilled in any event. The sole issue in controversy was the "status" requirement in § 902(3).

neither the text of the Act nor its legislative history offers any very clear guidance concerning the scope of "maritime employment." The closest approach is the illustrative example in the Committee Reports of unloading cargo from a ship and transporting it to a holding or storage area adjoining navigable waters—employees performing this work would clearly be covered. H.R. Rep. No. 1441, 92d Congress, 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Ad.News 4698, 4708. By contrast, illustrative examples of employees who would *not* be covered are those "whose responsibility is only to pick up stored cargo for further trans-shipment" and "purely clerical employees whose jobs do not require them to participate in the loading or unloading of cargo." *Id.* These examples, of course, are not exhaustive, and they do not indicate a clear standard for all situations. *Caputo,* 432 U.S. at 267, 97 S.Ct. at 2359.

In *Caputo,* the Court took an "expansive view" of coverage under § 902(3), *id.* at 268, 97 S.Ct. at 2359, and held that an employee "whose job was to check and mark items of cargo as they were unloaded from a container" was clearly covered because his function was "an integral part of the unloading process," *id.* at 271, 97 S.Ct. at 2361. The Court noted that this reasoning followed the legislative intent expressed in the Committee Reports cited above, which mentioned checkers (in contrast to "purely clerical employees") as employees "who are directly involved in the loading or unloading functions" and therefore within the scope of § 902(3). *Id., quoting* H.R.Rep. No. 1441, *reprinted in* 1972 U.S. Code Cong. & Ad.News at 4708.

The Court in *Caputo* also held that the touchstone for coverage under § 902(3) is not "whether or not [the employee's] particular task at the moment of injury is clearly a 'longshoring operation,'" 432 U.S. at 276, 97 S.Ct. at 2363, but rather whether the employees "spend at least some of their time in indisputably longshoring operations." *Id.* at 273, 97 S.Ct. at 2362. Thus, the second employee in that case also met the requirements of § 902(3), regardless of the sort of work he was actually performing at the time of injury, because "[a]s a member of a regular stevedoring gang, he participated on either the pier or the ship in the stowage and unloading of cargo," and "could have been assigned to any one of a number of tasks necessary to the transfer of cargo between land and maritime transportation." *Id.*

More recently still, the Court reaffirmed that, in determining coverage under § 902(3),

> the crucial factor is the nature of the activity to which a worker may be assigned. Persons moving cargo directly from ship to land transportation are engaged in maritime employment.... A worker responsible for some portion of that activity is as much an integral part of the process of loading or unloading a ship as a person who participates in the entire process.

*P.C. Pfeiffer Co., Inc. v. Ford,* 444 U.S. 69, 82–83, 100 S.Ct. 328, 337, 62 L.Ed.2d 225 (1979).

In light of *Caputo* and *Ford,* we have adhered to our traditional approach of determining § 902(3) coverage by looking at "the *actual* nature of [the employee's] regularly assigned duties as a whole." *Prolerized New England Company,* 637 F.2d at 38 (emphasis in original), *citing Stockman v. John T. Clark & Son of Boston, Inc.,* 539 F.2d 264, 275 (1st Cir.1976), *cert. denied,* 433 U.S. 908, 97 S.Ct. 2972, 53 L.Ed.2d 1029 (1976). We think this standard follows logically from the Supreme Court's holdings, and indeed is implicitly endorsed in them. In the present case, however, the Board seems to have overlooked, or at best misapplied, the rule in this circuit. We disagree with the Board's reasoning in two material respects which correspond to the two limbs of our standard.

■ First, it is the employee's actual duties rather than a formal job classification that must be looked at in determining coverage. The ALJ's finding that petitioner's duties included checking that the correct containers were loaded and unloaded properly went behind the formal title of

"book clerk" (and the job description in the collective bargaining agreement) to the practical substance of petitioner's function at work. The Board, however, without openly disturbing the ALJ's fact findings and without explaining why petitioner's job as a book clerk should be viewed as "purely clerical [and having] nothing to do with the actual loading or unloading of cargo," appears to have assumed categorically that petitioner's "work as a clerk [did] not constitute maritime employment." In doing so, the Board departed from the functional approach prescribed by the Supreme Court. We reiterate that "[t]he Supreme Court in *Caputo* and *Ford* did not restrict 'longshoring operations' to the actual carriage of cargo but applied a far more inclusive standard ...." *Prolerized New England Company,* 637 F.2d at 36. A function such as petitioner's is not to be excluded merely because it is described as clerical, but must be looked at in relation to the "indisputably maritime" activities of loading and unloading ships, transporting cargo, and repairing or building equipment. *See Graziano v. General Dynamics Corp.,* 663 F.2d 340, 342–43 (1st Cir.1981); *id.* at 345–46 (Campbell, J., dissenting). It is, of course, clear that "support services equally suited to land-based enterprises, such as office clerical work, do not qualify as maritime employment," *Prolerized New England Company,* 637 F.2d at 37, yet we recognize that even some "clerical" work qualifies as "peculiarly maritime" for purposes of the Act. While much "office clerical work" such as payroll processing, for example, might be performed in virtually complete independence from the actual longshoring operations, and would differ in no significant respect from comparable work done in a nonmaritime setting, the petitioner's work here clearly required that he be physically present at the terminal during the loading and unloading of cargo to speak with runners and

hatch clerks and, if necessary, inspect the numbers on the cargo containers himself. The ALJ's analogy between petitioner's work and that of a checker is apt. The legislative history of the Act gives checkers as an example of a subcategory of clerical workers covered:

> [P]urely clerical employees whose jobs do not require them to participate in the loading or unloading of cargo [are not covered]. However, checkers, for example, who are directly involved in the loading or unloading functions are covered ....

H.R.Rep. No. 1411, *reprinted in* 1972 U.S. Code Cong. & Ad.News at 4708.

Our second disagreement with the Board concerns the meaning of "regularly assigned duties as a whole." The Board, relying on the Third Circuit's pre-*Caputo* decision in *Maher Terminals,* 548 F.2d 476, apparently focused exclusively on petitioner's "primary" work "as a clerk documenting goods received and delivered," and disregarded his activity at the container yard and his function as a surrogate runner for ships weighing less than 300 tons.[3] Quite apart from the Board's evaluation of petitioner's clerical function, we do not think that the Board was entitled to recast the duties performed outside the office as "nonroutine and irregular" and to discount them on that basis. The "primary function" standard has not been mentioned, much less endorsed, by the Supreme Court; indeed, *Caputo* indicates that workers who spend only "at least some of their time in indisputably longshoring operations" are covered. We think that the primary function test is no more consistent with *Caputo* than the "substantial portion" test rejected by the Fifth Circuit in *Boudloche v. Howard Trucking Co., Inc.,* 632 F.2d 1346, 1347–48 (5th Cir.1980), *cert. denied,* 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981), and by

---

**3.** The Board stated that "when ships under three [sic] tons arrived in port, claimant boarded ship and performed the duties of a runner, as well as his usual book clerk duties," and entirely omitted further reference to this function in its lead opinion. The concurrence assumed that petitioner "was regularly employed as a purely clerical worker" who "only occasionally left his office to go down to the dock to check his documents against the incoming cargo or to act as a runner on ships under three [sic] tons," and thus avoided treating the latter functions as part of petitioner's overall work.

this court in *Graziano,* 663 F.2d at 343–44.[4] Although, as the Fifth Circuit noted in *Boudloche,* a worker's maritime function might in some circumstances be so "momentary or episodic" that it does not meet the minimum threshold under *Caputo,* 632 F.2d at 1348, we have not been confronted with such a *de minimis* situation in prior cases, see *Graziano,* 663 F.2d at 343–44, and certainly need not address it here. We think that the ALJ's findings clearly established that petitioner's indisputably maritime activities outside the office were part of his regularly assigned duties as a whole: he was required to work as a runner in practice whenever ships under 300 tons were loaded or unloaded, as well as to go out to the container yard whenever there was a discrepancy between the manifest number and the number actually on a container. These do not appear to have been discretionary or extraordinary occurrences, but rather a regular portion of the *overall* tasks to which petitioner could have been assigned as a matter of course. *See Caputo,* 432 U.S. at 273, 97 S.Ct. at 2362; *Graziano,* 663 F.2d at 434.

 We conclude that petitioner was engaged in maritime employment and covered under § 902(3) of the Act. As a consequence, the issue of the ALJ's attorney's fee award is still live. The record does not affirmatively show that petitioner's original application for approval of attorney's fees was served on the employer. Although the ALJ pared down the requested figure to proportions which he deemed reasonable, we agree with the Ninth Circuit that due process requires that the employer be given notice and an opportunity to be heard with respect to attorney's fee awards. *Todd Shipyards Corp. v. Director, Office of Workers' Compensation Programs,* 545 F.2d 1176, 1178–81 (9th Cir.1976). We therefore reverse the Board's ruling and remand for proceedings consistent with the foregoing.

*So ordered.*

4. Although we noted in *Prolerized New England Company,* 637 F.2d at 37, that "a substantial portion" of the employee's duties involved longshoring activity, we did not purport to impose this as a threshold requirement for statutory coverage, nor has the Board relied on our holding for such a proposition.